# In the United States Court of Federal Claims

No. 12-97C
(Filed April 16, 2012) 1/

```
* * * * * * * * * * * * * * * * * * * * * *    *
                                              *
CONTRACTING, CONSULTING,                      *    Post-award bid protest; 28
ENGINEERING LLC,                              *    U.S.C. § 1491(b)(1) (2006);
                                              *    permanent injunctive relief;
              Plaintiff,                      *    burden on protester to show that
                                              *    procurement decision is
       v.                                     *    unreasonable; whether a
                                              *    protester must succeed on all
THE UNITED STATES,                            *    three equitable factors in
                                              *    addition to succeeding on the
              Defendant,                      *    merits.
                                              *
       and                                    *
                                              *
DYNCORP INTERNATIONAL LLC,                    *
                                              *
       Defendant-Intervenor.                  *
                                              *
* * * * * * * * * * * * * * * * * * * * * *    *
```

David S. Black, Tysons Corner, VA, for plaintiff. Terry L. Elling, Jacob W. Scott and Oliya S. Zamaray, Holland & Knight LLP, of counsel.

Devin A. Wolak, Washington, DC, with whom was Acting Assistant Attorney General Stuart F. Delery, for defendant. Kathleen D. Martin, U.S. Department of State, of counsel.

Richard J. Vacura, McLean, VA, for defendant-intervenor. K. Alyse Latour and Susan J. Borschel, Morrison & Foerster LLP, of counsel.

## ORDER ON PERMANENT INJUNCTION AND ORDER FOR ENTRY OF JUDGMENT

_____

1/ This opinion was originally issued under seal on April 3, 2012. The parties were requested to notify the court of any redactions. Defendant and intervenor did not request any redactions. Plaintiff's redactions have been adopted.

**MILLER**, Judge.

This post-award bid protest is before the court after argument on the parties' cross-motions for judgment on the administrative record.  The issue for decision implicates the reasonableness of a technical review panel's determination, based on the experience of several members, to apply an assumed typical length of military service for domestic and overseas tours to two proposed former servicemembers when the solicitation required, in the first instance, that résumés for those personnel list the respective periods for their qualifying activities.

## FACTS

### I.  The Solicitation

On June 7, 2011, the United States Department of State (the "agency") issued Request for Proposal ("RFP") designated Solicitation No. SAQMMA11R0043 (the "Solicitation") seeking proposals for supplies and services to support the agency in assisting the Colombian National Police Aviation ("ARAVI") program that operates throughout Colombia in furtherance of the agency's counternarcotics effort.  Contracting, Consulting, Engineering LLC ("plaintiff") was the incumbent contractor on the previous iteration of the contract and had been performing pursuant to a task order issued under its General Services Administration ("GSA") contract (the "GSA task order").  See First Decl. of Terry Lord (separate signature page undated), ¶ 4.  The task order was effective from July 12, 2010, through July 11, 2011, and was necessary to accommodate the follow-on acquisition under the Solicitation.  Id.  Because it was apparent that the new award would not be made until after expiration of the GSA task order, the agency exercised its option and issued a three-month task order pursuant to 48 C.F.R. ("FAR") § 52.217-8 (2011), extending plaintiff's performance under the contract through October 2011.  The agency decreased the scope of the services to be provided under the task-order extension.  Plaintiff was ordered to decrease the number of personnel and cease procurement of aviation spare parts.

The Solicitation informed offerors that award would be made to the lowest-priced, technically acceptable offeror.  On September 15, 2011, plaintiff was notified via e-mail that it was an unsuccessful offeror.  Compl. filed Feb. 10, 2012, ¶ 31.  Plaintiff filed a pre-award protest the following day with the United States Government Accountability Office (the "GAO").  Id.  On September 30, 2011, the agency opted to take corrective action and informed the GAO that it would reevaluate past performance and reconsider deficiency determinations.  Id.  The agency confirmed its intention in an October 3, 2011 e-mail sent to the GAO.  Id.

On October 15, 2011, the agency awarded Contract No. SAQMMA11C0225 (the "Contract") to DynCorp International ("intervenor") after determining that it was the only technically acceptable offeror.  Id. ¶ 1; see also First Lord Decl. ¶ 6.  On October 27, 2011, the agency notified plaintiff via e-mail that it was an unsuccessful offeror because its proposal was rated technically unacceptable.  Compl. ¶ 32.

## II.  Protests before the GAO

Plaintiff filed a post-award protest with the GAO on October 28, 2011.  In accordance with the Competition in Contracting Act, 31 U.S.C. § 3553 (2006), the agency issued a stop-work order.  Shortly thereafter, M-7 Aerospace ("M-7")—another unsuccessful offeror—also filed a post-award protest with the GAO.

Due to the GAO protests, the agency issued the final three-month extension permitted by FAR 52.217-8, which enabled plaintiff's performance through January 10, 2012.  This task order, similar to the task order extending plaintiff's performance through October 2011, was also of decreased scope.  On January 11, 2012, because the GAO protests still were pending and the current task order had expired, the agency issued a three-month sole-source task order to plaintiff.  The period of performance pursuant to this task order ends on April 10, 2012.

Plaintiff's protest challenged the agency's evaluation of both its proposal and intervenor's.  See AR 1304.  The agency assigned plaintiff a "marginal" rating for program management after concluding that plaintiff's proposed deputy program manager ("DPM") did not satisfy the Solicitation's requirement that he possess five years of program-management experience.  See id. at 1304-05.  Plaintiff took the position that a proposed candidate was not required to have five years of experience as a program manager; rather, a candidate satisfied the requirement by demonstrating that he had the requisite five years of experience in any of the various sub-areas within the field of program management.  Id. at 1305.  Even if plaintiff's proposed DPM did not have the required experience, plaintiff contended that assignment of a "marginal" rating was unreasonable, given that the proposed candidate had been serving as the only full-time manager under the extended incumbent contract and thus he could not be considered a significant risk.  Id. at 1306.  Moreover, plaintiff posited that a "marginal" rating, which differed from an "unacceptable" rating, did not render it ineligible for award.  Id.

Plaintiff also protested that the agency "unequally evaluated" the proposals, explaining that intervenor's proposed program manager ("PM") and DPM failed to satisfy the Solicitation's requirement that candidates have five years of program-management experience, yet intervenor's proposal was not rated "marginal."  Id. at 1307.  Plaintiff's other

protest ground—that intervenor should have received an "unacceptable" rating for freight forwarding—is not relevant to the matter before the court.

Plaintiff's protest was denied on February 2, 2012. AR 1302, 1309. The GAO noted that its role was limited to "examin[ing] the record to determine whether the agency's judgment was reasonable, and in accord with the RFP criteria and applicable procurement statutes and regulations." Id. at 1304. Following its reading of the Solicitation, the GAO agreed with the agency that plaintiff misconstrued the program-management requirement. Id. at 1305. The GAO determined that, in order to give effect to all of the Solicitation's provisions, the program-management requirement must be understood as requiring that a candidate have five years of experience as a program manager. Id. Plaintiff's position—that five years of experience in any sub-area within the program-management field was sufficient—effectively would negate the requirement that candidates have eight (for DPM candidates) or ten (for PM candidates) years of project-management experience. Id. at 1305-06. The GAO thus found the agency's determination that plaintiff's DPM lacked the requisite five years of program-management experience to be reasonable. Id. at 1306. Accordingly, the "marginal" rating assigned to plaintiff's proposal was not unreasonable because that rating applied to proposals that failed to satisfy certain evaluation criteria, although they might meet the requirement with revisions. Id. A "marginal" rating could be the basis of a finding of ineligibility to receive the award. Id. at 1306-07.

The GAO disagreed with plaintiff that the agency unequally evaluated intervenor's proposal. See id. at 1307-08. Following its review of intervenor's proposed PM and DPM, the agency found that each possessed the requisite five years of program-management experience. Id. at 1307. This determination was based on various military positions that the candidates listed in their résumés submitted with intervenor's proposal. Id. The GAO remarked that the proposal was evaluated by three retired military officers who, given their familiarity with the responsibilities inherent in each position, concluded that intervenor's candidates possessed the required five years of experience. Id. Acknowledging the expertise with which the agency's determination was made, the GAO stated that plaintiff had failed to show that the decision was unreasonable and denied the protest. 2/ Id. at 1307-09.

_____

2/ It is evident from the Administrative Record ("AR") filed in this matter that, in deciding plaintiff's protest, the GAO had before it the undated Declaration of Kyle A. Richardson. See AR 1273-79. Mr. Richardson's declaration presents a compendium of the Technical Evaluation Panel's (the "TEP's") evaluation of intervenor's proposed PM and DPM. See id. It identifies the relevant Solicitation provisions, the adjectival ratings that could be assigned, intervenor's statements regarding its candidates' qualifications, and the TEP's position-by-position analysis used to determine whether the candidates possessed the requisite five years of program-management experience. See id. It also indicates that the TEP applied a standard in which candidates were credited with three years of experience for

The GAO subsequently denied M-7's protest on February 13, 2012. Def.'s Br. filed Feb. 21, 2012, at 9. On February 14, 2012, Terry Lord, Jr., Administrative Contracting Officer for the ARAVI program, lifted the stop-work order.

III. <u>Proceedings in the United States Court of Federal Claims</u>

On February 10, 2012, plaintiff filed a complaint in the United States Court of Federal Claims alleging that the agency's determination that intervenor submitted the only technically acceptable proposal was arbitrary and capricious because intervenor's proposal "fails to meet the Solicitation's express requirements for senior program management staff" and "violates the terms of the Solicitation in pricing the procurement and freight forwarding functions."

_____

<u>2</u>/ (Cont'd from page 4.)

domestic military assignments and one year of experience for overseas military assignments. <u>See id.</u> at 1277. Because plaintiff's GAO protest challenged the nature of the responsibilities that constituted program-management experience, and not the amount of time credited to a candidate for service in a particular position, the GAO's opinion did not mention Mr. Richardson's declaration nor the three-year/one-year standard.

All subsequent citations to Mr. Richardson's declaration will be to the version included in the appendix to Plaintiff's Memorandum in Support of Motion for Preliminary Injunction, filed on February 16, 2012. The court discovered that the version of Mr. Richardson's declaration in the Administrative Record filed with the court differed from that accompanying plaintiff's motion for preliminary injunctive relief. Peculiarly, the declarations are almost identical, save for the inclusion of the word "typically" in the declaration filed with plaintiff's motion. <u>Compare</u> Decl. of Kyle A. Richardson (separate signature page undated), ¶¶ 7-8 ("In addition, based on the knowledge and experience of the retired officers on the panel, such positions . . . are typically for controlled tours of 3 years for a domestic assignment and 1 year for an overseas assignment.") <u>with</u> AR 1276-77 ("Additionally, based on the experience of the retired officers on the panel, an overseas tour was considered 1 year of experience and a domestic tour was considered 3 years . . . .").

During oral argument the court queried the parties about the discrepancy. On March 30, 2012, the court granted defendant's Motion for Leave To Respond to the Court's March 29, 2012 Order and "Explanation for the Two Richardson Declarations," filed earlier that date. Defendant explained that, in compiling the administrative record, it inadvertently included a draft of Mr. Richardson's declaration in lieu of the version that actually was submitted to the GAO. Def.'s Br. filed Mar. 30, 2012, at 2. The declaration accompanying plaintiff's motion and referring to typical tours of duty is the version of the declaration that was provided to the GAO. <u>Id.</u>

Compl. ¶¶ 12-13.  Plaintiff sought permanent injunctive relief prohibiting the agency from authorizing intervenor to begin performing the Contract and requiring the agency to amend the Solicitation and request revised proposals, as necessary.

On February 16, 2012, pursuant to the parties' proposed briefing schedule, plaintiff filed its Motion for Preliminary Injunction.  Defendant and intervenor opposed on February 21, 2012.  On February 23, 2012, plaintiff filed Plaintiff's Motion for Leave To File Second Declaration of Stephen [H.] Harris.  The following day the court heard oral argument on plaintiff's motion for preliminary injunctive relief.  Over defendant's objection the court granted plaintiff's motion for leave to file Mr. Harris's second declaration because the subject matter consisted of showings for the three injunctive criteria relating to irreparable harm, balance of hardships, and the public interest—showings that are made only in a judicial proceeding.  That same day the court issued an opinion denying plaintiff's request for a preliminary injunction and setting forth a briefing schedule for cross-motions for judgment on the administrative record.  That opinion was reissued on March 12, 2012, after the parties had an opportunity to request redactions.  See Contracting, Consulting, Eng'g LLC v. United States, No. 12-97C, 2012 WL 769102, *9 (Fed. Cl. Mar. 12, 2012).

Plaintiff filed its motion for judgment on the administrative record on March 9, 2012.  It also filed Plaintiff's Motion for Leave To Supplement the Administrative Record with Army regulations (ECF No. 38); Plaintiff's Motion for Leave To Supplement the Administrative Record and the Court Record with the Third Declaration of Stephen [H.] Harris (ECF No. 39); and Plaintiff's Motion for Leave To Supplement the Administrative Record with two declarations by military experts (ECF No. 40).  By order entered on March 12, 2012, the court expedited briefing on the motions to supplement.  Defendant filed a combined response on March 14, 2012.  Plaintiff filed its combined reply on March 16, 2012.  On that same date, defendant and intervenor 3/ filed their oppositions to plaintiff's motion for judgment on the administrative record and their cross-motions.  On March 19, 2012, the court ruled on plaintiff's three motions to supplement the administrative record, as follows:

> 1.  Plaintiff's Motion for Leave To Supplement Administrative Record is denied, and the regulations will be deemed authorities cited in support of plaintiff's motion for judgment on the administrative record.

> 2.  Plaintiff's Motion for Leave To Supplement Administrative Record and the Court Record is granted, with the caveat that the TEP evaluators' disinclination to draw on their personal experience with plaintiff as incumbent

---

3/  Intervenor's brief adopted the arguments made in defendant's brief.  Intvr.'s Br. filed Mar. 14, 2012, at 2.

to qualify plaintiff's proposal would be relevant only to a claim for disparate treatment, which has not been pleaded.

   3. Plaintiff's Motion for Leave To Supplement Administrative Record is granted only insofar as the . . . declarations [from military experts] address the issue of whether the Army recognizes a typical duration for overseas and domestic assignments.  This includes ¶¶ 1-3 and 9-10 of the Sottak Declaration and ¶¶ 1-3 and 6 of the Dailey Declaration.  Plaintiff's motion otherwise is denied.

Contracting, Consulting, Eng'g LLC v. United States, No. 12-97C, 2012 WL 928215, at *6 (Fed. Cl. Mar. 19, 2012).

 On March 20, 2012, plaintiff filed its opposition to defendant and intervenor's cross-motions, its reply to defendant and intervenor's response to plaintiff's motion for judgment, and a motion to supplement the administrative record with the Fourth Declaration of Stephen [H.] Harris and the Declaration of Carroll J. Melancon, Jr.  The court granted plaintiff's motion by order dated March 22, 2012, noting that it would treat the declarations as appendices to plaintiff's brief filed that same date because the foregoing were not part of the Administrative Record, but complemented plaintiff's briefs on showings for injunctive relief required in a judicial proceeding—not before the GAO.  On March 23, 2012, defendant and intervenor 4/ filed their replies to plaintiff's response to their cross-motions.  On that same date, defendant also filed a motion to complete the administrative record with declarations from three members of the agency's TEP.  Plaintiff responded to defendant's motion to complete the record on March 26, 2012.  On March 27, 2012, the court denied defendant's motion as untimely, but admitted the declarations in connection with affording the deference that defendant requests be accorded Mr. Richardson's explanation for the TEP's actions.  That same day plaintiff filed the Fifth Declaration of Stephen H. Harris, which, by this point, everyone understood had nothing to do with the record before the agency, but was appropriate for the judicial proceeding.

 Argument on the parties' cross-motions was held on March 28, 2012.  During argument defendant sought leave to file the Fourth Declaration of Terry Lord in response to Mr. Harris's fifth declaration.  Plaintiff did not oppose defendant's request.  On March 29,

---

  4/ In its filing intervenor stated that "the Government has fully addressed all protest issues" and adopted the arguments made in defendant's brief.  Intvr.'s Br. filed Mar. 23, 2012, at 1.

2012, the court granted defendant's motion in part.  The order prohibited the parties from filing additional declarations. 5/

## DISCUSSION

I.  Standard of review in bid protest actions

The Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874 (codified at 28 U.S.C. § 1491(b) (2006)) (the "ADRA"), amended the Tucker Act, 28 U.S.C. § 1491(b)(1), granting the Court of Federal Claims jurisdiction over bid protests.  See Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1243 (Fed. Cir. 2010); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330-32 (Fed. Cir. 2001) ("Domenico Garufi").  The ADRA's standard of review for agency procurement decisions adopted the standard of review set forth in the Administrative Procedure Act, 5 U.S.C. § 706 (2006) (the "APA").  See 28 U.S.C. § 1491(b)(4).  The court has authority under the APA to set aside only an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); see also PGBA, LLC v. United States, 389 F.3d 1219, 1224-27 (Fed. Cir. 2004) (clarifying that ADRA incorporates arbitrary and capricious standard of APA to review procurement decisions); see also Domenico Garufi, 238 F.3d at 1332-33 (making applicable the standards applied in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and its progeny to bid protests).

Accordingly, as restated by the United States Court of Appeals for the Federal Circuit, "[a] bid protest proceeds in two steps."  Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  First, the court determines if, under the arbitrary and capricious standard, the agency acted either (1) without rational basis, or (2) contrary to law.  Id.; see Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004); Domenico Garufi, 238 F.3d at 1332-33; Aeroplate Corp. v. United States, 67 Fed. Cl. 4, 8 (2005).  Second, if the court finds that the agency acted in violation of the APA standard, "then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct."  Bannum, 404 F.3d at 1351; see also Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996).  In either case the plaintiff bears the "heavy burden" of proving this lack of rational basis or violation of the law by a preponderance of the evidence.  Domenico Garufi, 238 F.3d at 1333.

If the agency action is determined to have violated an applicable procurement regulation, the court proceeds to address whether the action was significantly prejudicial to

---

5/  The order excepted the explanation for the two versions of Mr. Richardson's declaration discussed supra note 2.

the protester.  See Bannum, 404 F.3d at 1351, 1353-54; see also Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) ("When a challenge is brought on the second ground [of the Bannum test], the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." (citation omitted) (internal quotation marks omitted)).  Even if a plaintiff can show that a procurement violation occurred, "[t]he prejudice determination assesses whether an adjudged violation of law warrants setting aside a contract award."  Bannum, 404 F.3d at 1354.  When making this evaluation, the court must be mindful that "[p]rejudice is a question of fact."  Id. at 1353 (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057 (Fed. Cir. 2000)).  "To establish prejudice, the claimant must show that there was a 'substantial chance it would have received the contract award but for that error.'"  Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1331 (Fed. Cir. 2004) (quoting Statistica, 102 F.3d at 1582); see also CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (explaining that, in order to show prejudice, plaintiff need only show "'that it was within the zone of active consideration'" (quoting Morgan Bus. Assocs. v. United States, 619 F.2d 892, 896 (Ct. Cl. 1980))); accord Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999).  It is important to note that a plaintiff need not establish strict but-for causation in order to meet its burden of demonstrating that the agency's procurement violation was prejudicial.  See Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996).

II.  Standards of review for judgment on the administrative record and for injunctive relief

The parties filed cross-motions for judgment on the administrative record pursuant to RCFC 52.1(c).  This rule provides a procedure that allows the court to expedite a trial by using a "paper record, allowing fact-finding by the trial court."  Bannum, 404 F.3d at 1356.  Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record.  Id. at 1355-56.

Plaintiff seeks a permanent injunction enjoining the agency from authorizing intervenor to commence contract performance and requiring it to reconsider its requirements, amend the Solicitation, request revised proposals, and terminate the Contract awarded to intervenor for the convenience of the Government.  The Federal Circuit has described injunctive relief as "extraordinary relief."  FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993); see CACI, 719 F.2d at 1581.  Adoption of the APA substantive standard of review did not change the standard for granting injunctive relief.  See PGBA, 389 F.3d at 1225-26 (clarifying that ADRA incorporates arbitrary and capricious standard of APA to review procurement decisions, but did not change court's discretion in granting remedy of injunctive relief).  In order to obtain an injunction, the Federal Circuit requires that the court consider whether "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the

respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citation omitted).

III.  The parties' arguments

    1.  Whether the agency's conclusion that intervenor's proposal was technically acceptable was grounded on a rational basis

The agency informed offerors that it would be evaluating their technical acceptability based on nine factors.  See AR 133-34.  One of these—Factor 1: Program Management, Subfactor F: Senior Program Management Staff/Key Personnel ("Factor 1, Subfactor F"), AR 136-37—established qualifications for individuals proposed as PM and DPM.  Factor 1, Subfactor F provided, as follows:

**Subfactor F:  Senior Program Management Staff/Key Personnel**

1.    The offeror provides a resume for the Program Manager that complies with the requirement of having at least five (5) years of experience in the area of program management in aviation programs and at least ten (10) years of professional Aviation managerial experience.  The PM shall be required to [be] a U.S. citizen and possess a Secret security clearance.

2.    The offeror provides a resume for the Deputy Program Manager that complies with the requirement of having at least five (5) years of experience in the area of program management in aviation programs and at least eight (8) years of professional Aviation managerial experience.

AR 137.  Section L.26.1.4.6 reiterated these qualifications, instructing offerors that the proposed PM and DPM must have a requisite number of years of both program-management and project-management experience by stating, as follows:

**L.26.1.4.6    Senior Program Management Staff/Key Personnel**

The offeror shall propose a Program Manager that complies with the requirement of having at least five (5) years of experience in the area of program management in aviation programs and at least ten (10) years of professional Aviation managerial experience.  The PM shall be required to [be] a U.S. citizen and possess a Secret security clearance. The offeror shall include the PM's resume.

The offeror[']s proposal shall include a resume for the Deputy Program Manager that complies with the requirement of having at least five (5) years of experience in the area of program management in aviation programs and at least eight (8) years of professional Aviation managerial experience.

AR 113.

The submitted résumés for an offeror's proposed PM and DPM also were subject to exacting requirements.  Section L.13 of the Solicitation provided, in pertinent part, that

   d)   *Resumes should clearly demonstrate the degree of significant experience as it relates to the position qualifications stated in this solicitation.  Significant experience is that specialized experience, which includes direct involvement, was of sufficient duration to achieve a continuing expertise, and was of a level of responsibility appropriate to verify employment commitments.*  Each resume shall contain the resume holder's signed statement that he/she grants permission for his/her resume to be submitted under this solicitation.

   e)   If resumes are provided for individuals not presently in your employ, your employment agreements with those individuals shall be provided with your proposal.  Employment agreements must contain specific salary quotations (not salary ranges), and shall be signed within 30 days prior to the date of submission of proposals.

   f)   If final proposal revisions are requested, the Offeror shall identify any changes to personnel for whom resumes were submitted.

AR 102 (emphasis added).  Moreover, proposals generally were subject to the requirement in section L.26—titled "Detailed Proposal Instructions"—that "the offeror . . . present information in sufficient detail to enable an evaluator, having a general professional expertise in the response area of interest, to thoroughly understand the response to th[e] solicitation." AR 109.  This instruction presupposes that the evaluators will draw on their own experience in order to assess the technical acceptability of the proposals.

Another proposal instruction—section L.26.1.3—specifically addressed offerors' technical proposals, imposing stringent requirements as to how offerors should present information.  This section stated, as follows:

### L.26.1.3      Technical/Management Compliance Cross-Reference Table

The RFP requirements pertaining to the Technical/Management Volume are summarized in the compliance cross-reference table in Section J. This cross-reference table is provided to assist the offeror(s) in preparing its proposal.

The Technical Response shall describe the offeror(s) approach to satisfy the requirements in:

1. Section C.1.0 – 1.8 Program Management
2. Section C.2.1 – Logistics And Procurement
3. Section C.2.2 – Maintenance
4. Section C.2.3 & C.3.0 & 8.0 – Quality Control
5. Section C.4.0 – Information Technology
6. Section C.5.0 thru [*sic*] C.10.3 –Training and Standardization

The offeror[']s *discussion must clearly and convincingly demonstrate how the requirements of the contract will be met*. The technical response shall demonstrate that the offeror has a comprehensive understanding of support to be provided; the ability to provide prompt delivery on short notice; and the ability to provide the required personnel.

AR 111 (emphasis added).

The Solicitation informed offerors that failure to comply with its instructions and requirements could result in an offeror's proposal being deemed ineligible for award. For example, section L.23, General Proposal Instructions, cautioned that "[o]fferor(s) shall examine and follow all instructions. Failure to do so may result in the proposal being determine[d] to be unacceptable and removed from consideration." AR 105. This warning is reiterated in section M.4, Eligibility for Award, which instructs that "[t]o be eligible for award, offerors are required to meet all solicitation requirements, such as terms and conditions, and non-price and price instructions in Section L. Failure to comply with all solicitation requirements may result in the offeror being removed from award consideration." AR 135. Despite this cautionary tone, a noncompliant proposal would not be disqualified automatically.

2. Plaintiff's arguments

The foregoing Solicitation provisions form the basis of plaintiff's protest. Plaintiff challenges that the TEP's conclusion that intervenor's proposal was technically acceptable lacks a rational basis. According to plaintiff, in evaluating intervenor's proposal, the TEP

improperly relied on information that was not contained in the proposal to conclude that intervenor's proposed PM and DPM each possessed the experience required by the Solicitation. Pl.'s Br. filed Mar. 9, 2012, at 10. Plaintiff explains that the résumés submitted by intervenor listed various positions that the proposed PM, Victor Fontanez, Jr., and DPM, Vidal Garza, each had held with the United States Army (the "Army"). Id. at 5-6. Although the résumés indicated the total number of years during which Messrs. Fontanez and Garza served in the Army, they did not specify the dates of service or number of years in each position. See AR 254 (providing Messrs. Fontanez's and Garza's résumés). Nor did the résumés identify the specific responsibilities performed in each position to enable the TEP to determine if the position entailed program- or project-management experience. Pl.'s Br. filed Mar. 9, 2012, at 6.

Nonetheless, plaintiff argues that the Army experience "was the lynchpin of the TEP's conclusion that [Messrs. Fontanez and Garza] each had the required five years of program management experience." Id. at 19; see also id. at 8-9.

Plaintiff explains that, due to the absence of this information from intervenor's proposal, the TEP made "general assumptions" about the nature of the duties that Messrs. Fontanez and Garza performed while serving in the positions listed in their résumés to determine if they amounted to program-management experience. Pl.'s Br. filed Mar. 9, 2012, at 10. However, the TEP lacked any personal knowledge regarding the individuals' actual performance of the listed positions. In evaluating whether the responsibilities inherent in each position amounted to program-management experience, the TEP considered whether the position entailed "management of several aspects of a program." Id. at 7 (referencing AR 1276 ("Key to considering this as [program management] experience, the TEP considered the fact that he [Mr. Fontanez] managed several aspects . . . affording him overall program management experience.")); see also AR 1277 ("This experience is relevant because Mr. Garza managed a program that contained many specific projects . . . ."). Plaintiff challenges that these "naked assumptions" resulted in an irrational evaluation. Id. at 23.

Plaintiff also argues that, because intervenor's proposal did not indicate the number of years served in each position, the TEP undertook its own analysis to ascertain the total number of years of qualifying service that the individuals possessed. Id. at 10. In the GAO proceedings, the agency explained that three members of the TEP formerly served as military officers and knew from their past experience that "positions . . . entailing command . . . of an airborne unit, company or battalion are typically for controlled tours of 3 years for a domestic assignment and 1 year for an overseas assignment." Id. (citations omitted) (internal quotation marks omitted). Thus, relying on the three TEP members' experience gleaned in the military, the TEP credited Messrs. Fontanez and Garza with three years of experience for domestic positions and one year of experience for overseas positions. According to plaintiff the TEP's reliance on general assumptions regarding program-management experience and

a three-year/one-year assumption regarding the duration of assignments resulted in the following assessments, as depicted in charts that plaintiff created for its moving brief: 6/

| Summary of the TEP's Evaluation of Fontanez's Experience | | |
|---|---|---|
| **Position** | **Dates on Resume** | **TEP Evaluation** |
| DynCorp International INL Bolivia Country Program Manager | 2008-Present | **3.5 Years of Program Management Experience** |
| AGC QA & Shift Manager U.S. and Mexico | 2002-2008 | 0 Years of Program Management Experience |
| EER Principal Analyst / Project Manager | 1997-2001 | 0 Years of Program Management Experience |
| U.S. Army | 1989-1997 | |
| Chief, Aeronautical Information Division Ft. Belvoir, VA | Unspecified | 0 Years of Program Management Experience |
| Chief, Cargo / Fixed-Wing and Chief, Standardization Div., Ft. Rucker, AL | Unspecified | **3 Years of Program Management Experience** |
| Aviation Battalion Executive Officer, Honduras | Unspecified | **1 Year of Program Management Experience** |
| MACOM Aviation Operations & Plans Officer, Panama | Unspecified | **1 Year of Program Management Experience** |
| U.S. Army | 1972-1989 | |
| Various Aviation Manager Positions | "9 years"; Dates Unspecified | 0 Years Program Management Experience |
| Pilot, Instructor, and Instrument Flight Examiner | "8 years"; Dates Unspecified | 0 Years of Program Management Experience |

| Summary of the TEP's Evaluation of Garza's Experience | | |
|---|---|---|
| **Position** | **Dates on Resume** | **TEP Evaluation** |

---

6/   The court, however, modified slightly plaintiff's presentation to avoid the impression that these charts represented any analysis prepared or utilized by the TEP. The charts display in graphical format the TEP's analysis.

| DynCorp International INL Colombia Operations / Nationalization Program Manger | 2010-Present | **1 Year of Program Management Experience** |
|---|---|---|
| MPRI Training Manager | 2007-2010 | 0 Years of Program Management Experience |
| U.S. Army | 1985-2007 | |
| Aviation Operations Officer Ft. Sam Houston, TX | Unspecified | **3 Years of Program Management Experience** |
| Theater Aviation Maintenance Officer, Kuwait | Unspecified | **1 Year of Program Management Experience** |
| JROTC Senior Instructor, San Antonio, TX | Unspecified | 0 Years of Program Management Experience |
| Company Commander, Korea | Unspecified | **1 Year of Program Management Experience** |
| Intel/Security Officer, Hunter AAF, GA | Unspecified | 0 Years of Program Management Experience |
| Company Executive Officer & Platoon Leader, Panama | Unspecified | **1 Year of Program Management Experience** |

Id. at 8-9 (citing AR 1275-78).

Plaintiff explains that, as a result of the TEP's assumptions regarding length of service and nature of duties constituting program-management experience, the TEP concluded that Mr. Fontanez had "8.5 years of program management experience, five years of which were from positions in the Army for which his resume did not provide dates of service." Id. at 8. Similarly, the TEP found that Mr. Garza had "seven years of program management experience, six years of which were from positions in the Army for which his resume did not provide dates of service." Id. at 9. The TEP consequently adjudged intervenor to be technically acceptable for Factor 1, Subfactor F. Id. at 19. Plaintiff challenges the assignment of this rating as irrational, explaining that the Solicitation prohibited the TEP's reliance on information outside the four corners of the proposal and not within the evaluators' personal knowledge. Id. Because the résumés did not include dates of service sufficient to show that the proposed PM and DPM possessed the requisite experience, as required by the Solicitation, plaintiff contends that the TEP should have concluded that intervenor's proposal was technically unacceptable. See id. at 18-19.

Moreover, plaintiff argues that the evaluators failed to consider relevant information contradicting the assumptions on which they relied. Id. at 19. Although the TEP chairman, Kyle A. Richardson, stated that other TEP members considered the three-year/one-year

15

assumption to be appropriate, see Richardson Decl. ¶¶ 7-8,  he did not reference any Army regulations that indicate that "the nature, context, conditions, and . . . approximate year of performance of a specific position" bear on the duration of a particular assignment, Pl.'s Br. filed Mar. 9, 2012, at 28; see also Army Reg. 614-100, Officer Assignment Policies, Details, & Transfers: Assignments, Details, and Transfers, ¶ 5-3 (July 15, 1984) ("Army Reg. 614-100") (setting forth twenty-eight exceptions that may curtail duration of military assignment). As an example, plaintiff cites Army Regulation 600-20, governing command assignments, alleging that it prescribes a duration that does not comport with the TEP's three-year/one-year assumption.  Pl.'s Br. filed Mar. 9, 2012, at 29.  Additionally, many regulations provide for reassignment or transfer, which may shorten the duration of an assignment.  See id. at 30-31.

Plaintiff also provided declarations from two individuals—both retired Brigadier Generals in the United States Army with careers as Army Aviators—that directly challenge the TEP's assumptions.  See id. at 32-33;  see also  Decl. of Barry J. Sottak, Mar. 9, 2012, ¶¶ 9-10; Decl. of John N. Dailey, Mar. 9, 2012, ¶ 6.  These declarations supply information that contradicts that of the TEP evaluators concerning the length of a typical tour of duty in the Army and dispute that the TEP had any reasonable basis for characterizing Messrs. Fontanez's and Garza's respective résumé experiences as qualifying experience that satisfied the Solicitation's requirements.  Generals Sottak and Dailey stated that, in their experience, the Army did not apply a three-year/one-year assumption to determine the length of a tour of duty and that no such "typical baseline" existed.  See Sottak Decl. ¶ 9; Dailey Decl. ¶ 6. General Sottak explained that Army policy provided that domestic and European tours were for two years.  Sottak Decl. ¶ 9.  He nonetheless qualified this statement, noting that exceptions to tour lengths, though uncommon, could be obtained for personal reasons and that, therefore, the TEP could not make assumptions about the duration of an assignment "[w]ithout knowing the specific facts about the individual serving in the position and the time and place at which the position is served."  Id.  General Dailey echoed this sentiment.  Dailey Decl. ¶ 6.

Finally, plaintiff contends that the evaluators acted arbitrarily in applying general assumptions in an unequal manner.  Pl.'s Br. filed Mar. 9, 2012, at 33.  Citing Professors Ralph C. Nash, Jr., and John Cibinic, Jr., plaintiff argues that the TEP's use of information outside the four corners of intervenor's proposal may have been permissible if it extended that practice to evaluation of the other proposals, including plaintiff's.  See id.  Plaintiff explains that it received an "unacceptable" rating because it did not demonstrate its ability to establish an account with the U.S. Army's Logistics Support Activity ("LOGSA"), see AR 894.  See Pl.'s Br. filed Mar. 9, 2012, at 33; Third Decl. of Stephen H. Harris, Mar. 9, 2012, at ¶ 27.  One member of the TEP, however, knew that plaintiff already had established a LOGSA account during its incumbency and did not draw on this personal knowledge. Third Harris Decl. ¶ 27.  Plaintiff also was rated "unacceptable" for failing to explain how it would

integrate Analysis, Design, Development, and Implementation Employee training ("ADDIE") into its training program, despite the fact that two members of the TEP were informed periodically during plaintiff's incumbency that plaintiff uses and incorporates ADDIE in its training programs, see AR 897.  See Third Harris Decl. ¶¶ 29-31.  Additionally, plaintiff noted that it received a "marginal" rating for failing to include in its proposal a management plan that satisfied criteria in the Solicitation, see AR 875-77. Pl.'s Br. filed Mar. 9, 2012, at 33-34.  In justifying the rating, the TEP stated that "'the Offeror states that they have satisfied the [management plan] requirement in the past . . . [but] the Offeror does not demonstrate a clear management plan . . . . [T]he [agency] cannot make the assumption that the Offeror understands based on past performance . . . .'"  Id. at 34 (first alteration in original) (quoting AR 877).

Plaintiff does not assert a claim for unequal or disparate treatment or contend that the evaluators should have treated its proposal differently, see Pl.'s Br. filed Mar. 20, 2012, at 16; instead, plaintiff contends that the TEP's failure to supply missing information based on the evaluators' experience with plaintiff's contract shows that they acted arbitrarily and capriciously in doing so for intervenor's technical proposal. Pl.'s Br. filed Mar. 9, 2012, at 35.  Plaintiff thus urges that, because the TEP's act of filling in gaps in intervenor's proposal lacks a rational basis and is arbitrary and capricious, its finding intervenor's proposal technically acceptable is irrational.  Id.

### 3. Defendant's arguments

Defendant responds that the Solicitation did not require résumés explicitly to include the dates of service corresponding to each listed position. Def.'s Br. filed Mar. 16, 2012, at 13.  The Solicitation merely stated, in both section L, see AR 113, and section M, see AR 137, that the résumés for a proposed PM and DPM shall "compl[y] with the requirement of having at least five (5) years of experience in the area of program management . . . ."  Id. (internal quotation marks omitted) (citing AR 113, 137).   According to defendant, intervenor's proposal complied with this requirement because it set forth each candidate's total number of years of program-management experience, clearly indicating that each satisfied the five-year requirement.  See id. at 13-14. Specifically, Messrs. Fontanez's and Garza's résumés stated that they had twenty-five and nineteen years of program-management experience, respectively.  See id.

Defendant also contends that section L.26 informed offerors that the TEP members would rely on their "professional expertise" in evaluating proposals, thereby providing that "an offeror's compliance with [the Solicitation's] requirements [would be] measured by the judgment of the evaluation committee."  Id. at 13 (citing AR 109).  In accordance with section L.26, defendant notes that the TEP members drew on their personal knowledge and experience to confirm that Messrs. Fontanez and Garza satisfied the Solicitation's

requirements, notwithstanding the aggregate number of years listed on each résumé for program-management experience. See id. at 15. In doing so, the TEP employed a three-year/one-year assumption, which was deemed accurate based on the experience of three TEP members who were retired military officers. See id. at 14 (citing AR 1276-77). The results of this evaluation differed from the information provided by intervenor because the TEP determined that some of the listed positions did not encompass program-management or project-management experience and thus did not count toward satisfaction of the five-year requirement. See id. at 15. The TEP ultimately concluded that each candidate had sufficient program-management experience and therefore deemed the proposal technically acceptable. See id. Defendant postulates that, because the TEP found intervenor's proposal technically acceptable, it also concluded that the proposal was fully complaint with the Solicitation's requirements governing the manner in which the information was required to be presented. See id. Moreover, even if the Solicitation did require that the proposal identify specific dates of service, a failure to include those dates did not require the agency to deem the proposal unacceptable because the Solicitation stated that noncompliance "*may*" result in a rating of "unacceptable." Id. at 15-16.

Defendant next challenges plaintiff's claim that the TEP's reliance on assumptions in finding Messrs. Fontanez and Garza qualified was not sufficiently explained in the record and lacked factual and legal support. Defendant notes that this argument essentially asks the court to create a recordkeeping requirement and impose that requirement on the TEP. See id. at 16-18. According to defendant, the basis for the TEP's use of assumptions in the evaluation process was the past military experience of its members, which the Solicitation expressly permitted the TEP to utilize. See id. at 18. Moreover, plaintiff "has not challenged the nature of the TEP's military expertise . . . or argued that the panel lacked the expertise to make these types of subjective judgments." Id. Defendant concludes that the TEP's actions have support in the Administrative Record, which is the "defining characteristic" of review under the APA, 5 U.S.C. § 706. Id.

Furthermore, defendant argues that the TEP was not required to consider whether any exceptions existed to its three-year/one-year assumption. Id. at 20. To the contrary, defendant asserts that case law provides that contracting personnel are not required to perform legal research in making procurement decisions. See id. (citing Brooks Range Contract Servs., Inc. v. United States, 101 Fed. Cl. 699, 716 (2012) (disagreeing with plaintiff-protester's suggestion that contracting officer with "ready access" to agency's legal department should have analyzed contractor teaming agreement for legal implications)). Moreover, the declarations that plaintiff obtained from Generals Sottak and Dailey were not available until after the TEP performed its evaluation, so the TEP appropriately did not consider that information. See id. at 21.

Finally, in addressing plaintiff's unequal-treatment argument, defendant notes that plaintiff has not set forth a separate claim based on unequal treatment. See id. at 22. Having failed to do so, plaintiff now reformulates its argument into a challenge that the TEP's act of filling in gaps in Messrs. Fontanez's and Garza's résumés is permissible if the TEP does the same for other offerors—an argument that runs counter to plaintiff's position that gap-filling on the basis of general assumptions is impermissible. See id. at 23. Defendant would not characterize plaintiff's request for gap-filling in its own proposal as a request for equal treatment. See id. The TEP filled gaps in intervenor's key-personnel résumés in order to make its own determination of whether Messrs. Fontanez and Garza satisfied the requirement for program-management experience, see id., despite the fact that that same information was included in the résumés in the form of a total number of years of experience. Plaintiff, however, suggests that the TEP should have supplied information in its proposal regarding ADDIE and LOGSA—material that plaintiff admits was omitted from its proposal. Id. Moreover, plaintiff's support for its argument is a recommendation from a hornbook on the procurement process. Id. Such authority certainly is not binding.

## IV. Rationality of the TEP's assumptions regarding duration of assignments

Despite defendant's contention that the Solicitation did not require that the résumés identify the amount of time spent in each position, the evaluation factors contemplated that offerors would clearly set forth the information necessary to demonstrate that their proposed PM and DPM had the required number of years of experience in each qualifying position. See AR 111 (providing, in section L.26.1.3, that "[t]he offeror['](s) discussion must clearly and convincingly demonstrate how the requirements of the contract will be met"); AR 109 (providing, in section L.26, that "the offeror shall present information in sufficient detail to enable an evaluator, having a general professional expertise in the response area of interest, to thoroughly understand the response to this solicitation"). The Solicitation's requirements are not satisfied by a résumé's providing the candidate's total number of years of program-management experience. It should be noted that the evaluators themselves did not accept the statement of aggregate years of service on either candidate's résumé. While, as defendant has noted, noncompliance with the Solicitation by failing to include such information did not render an offeror technically unacceptable, see AR 135 (noting, in section M.4, that, "[t]o be eligible for award, offerors are required to meet all solicitation requirements . . . [and that] [f]ailure to comply with all solicitation requirements may result in the offeror being removed from award consideration"), plaintiff has established that the TEP's assignment of dates of service to the positions held by Messrs. Fontanez and Garza was based on an assumption that the three members' experience with typical durations for tours of duty in the Army could apply to a particular individual. The TEP's conclusion that intervenor's proposal was technically acceptable does not lack a rational basis merely because the proposal was not fully compliant with Solicitation requirements. This is a red herring as the deficiency is not one of completeness, but the rationality of applying a key assumption.

In evaluating intervenor's proposal, the TEP proceeded to assess each position to determine whether it entailed program-management experience.  See Richardson Decl. ¶ 7 ("In reviewing each separate job description, the TEP considered whether the experience qualifies as 'in the area of program management.'").  If a particular position required that the candidate "manage[] several aspects" of a program, the TEP concluded that it constituted program-management experience.  Id.  Once the TEP determined that a position was qualifying, it assigned a duration to it based not on the actual period of time during which Messrs. Fontanez or Garza served in that position—presumably an objective fact susceptible of verification—but on the assumption that domestic assignments typically lasted for three years and overseas assignments lasted for one year.  See Richardson Decl. ¶¶ 7-8.

Despite having engaged in this multi-step evaluation, the TEP did not mention its efforts in its Technical Evaluation Consensus Report that set forth its evaluation of intervenor's proposal and determination whether or not the proposal satisfied the Solicitation's requirements.  AR 910.  In fact, in remarking on intervenor's ability to satisfy the qualifications in Factor 1, Subfactor F, the TEP stated only that "[t]he offeror provides compliant resumes for both PM and DPM positions.  The PM meets the security clearance and citizenship requirements, as well as PM Aviation and Aviation Mgmt Experience.  The DPM meets the minimum requirements."  Id.  Notably, plaintiff did not ground its protest on the TEP's failure to observe any instruction or applicable regulation that required a fuller explication of how the TEP members analyzed the specific showings that the offerors had been instructed to include in the résumés for PM and DPM, nor does the court attach any significance to the conclusory evaluation.  The agency was allowed to elaborate on the TEP's evaluation process before the GAO, and it took advantage of the opportunity.

During plaintiff's second GAO protest, the agency submitted a declaration from Mr. Richardson.  His declaration interjected the rationale for the TEP's determination that the résumés were compliant.  See Richardson Decl. ¶¶ 7-8.  It was Mr. Richardson, not plaintiff, who introduced the fact that the TEP members did not accept the résumés' statements of aggregate experience.  He explained that the TEP assigned a duration to each position that was listed as involving qualifying experience.  See id.  It was he who explained that three TEP members who are retired military officers 7/ drew on their experience to apply a standard to determine a typical length of a tour of duty.  Id. (providing that, "based on the knowledge and experience of the retired officers on the panel, such positions . . . are typically for controlled tours of 3 years for a domestic assignment and 1 year for an overseas assignment").

---

7/ Agency counsel confirmed at argument that the TEP had five members, including Mr. Richardson.

The Solicitation contemplated that the evaluators would rely on their personal experience.  See AR 109.  Nonetheless, the court cannot accept defendant's circular argument that, as long as the TEP relied on its members' experience, the application of the assumption to determine the duration of service was reasonable because the presumption of regularity enshrouds the statement that they relied on their experience.  One assumes that this means that, if a government evaluator can rely on his experience and the agency asserts that he, indeed, did so, a protester cannot challenge whether the tool was rationally applied to the determination, or else the protester would be heard to question the evaluator's probity.  The court trusts that no time need be spent on this argument, as it is self-discrediting.

The precise lengths of the tours of duty that Messrs. Fontanez and Garza served are objective facts.  To determine those facts, the TEP employed the three-year/one-year assumption.  At first blush this approach appears rational, given that the assumption purports to be based on typical overseas and domestic tours of duty that can be considered reasonable.  However, plaintiff has cited almost 700 pages of Army regulations in support of its contention that the assumption upon which the TEP relied is irrational because the duration of assignments is not a matter that lends itself to relative assumptions.

Various regulations prescribe durations for assignments that contradict or challenge the three-year/one-year assumption employed by the TEP.  See Army Reg. 614-30, Overseas Service: Assignments, Details, & Transfers, ¶ 3-3.a.–c. (Apr. 14, 2010) ("Army Reg. 614-30"); Army Reg. 600-20, Army Command Policy: Personnel—General, ¶ 2-3.d. (Apr. 29, 1988) ("Army Reg. 600-20"); Army Reg. 614-100, ¶¶ 5-1.c.(2)-(3), 5-3, 5-4; Army Reg. 614-5, Stabilization of Tours: Assignments, Details, & Transfers, ¶¶ 2-1, 2-3 (May 1, 1983) ("Army Reg. 614-5").  While Army Reg. 614-100, ¶ 5-1.c.(2) provides that "[t]he CONUS ["Continental United States"] tour *objective* is a minimum of 36 months on station," Army Reg. 614-100, ¶ 5-1.c.(2), this provision cannot be read in a vacuum.  Paragraph 5-3. of that same regulation sets forth twenty-eight exceptions that will alter the thirty-six-month objective for domestic assignments.  See id. ¶ 5-3.  Additionally, paragraph 5-4. states that one assigned to an overseas tour will remain in that assignment for the period prescribed by the tour, which requires reference to Army Reg. 614-30—the regulation that implemented Department of Defense Directive ("DODD") 1315.7.  See id. ¶ 5-4.

In establishing the duration of overseas assignments, DODD 1315.7 considers the location of the assignment and whether personnel will be accompanied or unaccompanied by dependents and immediate family members.  See DODD 1315.7, ¶ 5.1.1., Enc. E3 (Jan. 9, 1987).  Enclosure 3, which sets forth the tour durations by country, indicates that overseas tours to Panama, Honduras, Kuwait, and Korea—the overseas locations in which Messrs. Fontanez and  Garza served—are for periods exceeding one year, unless the individual is traveling unaccompanied, and even then, assignments in Panama and Honduras were for eighteen months.  See id. at E3.  This would suggest that the TEP's analysis applied the

minimum tour duration—and thus a conservative estimate for overseas tours only—in determining the length of time served.  Yet, durations of overseas tours are subject to exceptions in the same manner as domestic tours.  One-year assignments may be curtailed for a number of reasons and are considered on a case-by-case basis.  See Army Reg. 614-30, Overseas Service: Assignments, Details, & Transfers, ¶¶ 3-3.g., 3-7., 5-1.a. (Apr. 14, 2010) ("Army Reg. 614-30").  8/  Although the Army has goals for the durations of domestic and overseas tours, the assumption that the goals equate to typical tours of duty that can be applied to determine the duration of service in which an individual discharged particular responsibilities is irrational.  9/

---

8/  Plaintiff has provided the court with a copy of the version of Army Reg. 614-30 that became effective on April 14, 2010.  It is likely that the provisions governing curtailment of overseas tours of duty have not changed substantially from those that were in effect when Messrs. Fontanez and Garza were serving their overseas tours.  Defendant has not objected to Army Reg. 614-30 on the basis that it was not in effect during the relevant time periods. The court has considered the regulation in deciding the pending cross-motions.

9/ The TEP retired military members' experience is not in issue, but illustrates the irrationality of applying the three-year/one-year assumption to determine the duration of an individual's tour of duty.  Their experience does not bear out that the goal for a typical tour of duty is a rational proxy for the duration of an individual's particular tour domestically or overseas. Defendant submitted declarations from the three TEP members referred to in Mr. Richardson's declaration as responsible for providing the three-year/one-year assumption. See Decl. of Shawn W. Flora (separate signature page undated); Decl. of Luis M. Rivera (separate signature page undated); Decl. of Gabriel Castro (separate signature page undated). Each declarant—Messrs. Flora, Rivera, and Castro—set forth his respective military experience.   Other  than  experience  serving  in  the  Army  National  Guard,  Mr. Flora—according to his declaration—did not have any domestic Army experience. See Flora Decl. ¶ 6.  He did, however, have two overseas Army assignments, serving one year in Korea and just over three years in Panama.  Id.  Mr. Flora's experience in Korea supports the one-year assumption for overseas tours, but his experience in Panama does not.

Mr. Rivera has both domestic and overseas Army experience.  See Rivera Decl. ¶ 6. Mr. Rivera's two domestic assignments were for two years and two-and-one-half years, respectively.  See id.  His overseas assignments were for one year, four years, and four-and-one-half years.  See id.  He also lists a total of five-and-one-half years of experience, which he attributes to both domestic and overseas service.  See id.  It is unclear what portion of this time was spent serving domestically and overseas.  Mr. Rivera's domestic experience belies the three-year assumption applied to Messrs. Fontanez's and Garza's domestic assignments. Tellingly, Mr. Rivera's domestic assignments were for less than three years.  See id.  As with

Defendant hastens to point out that the TEP evaluators should have been satisfied with the résumés' claims of twenty-five and nineteen years of program-management experience that were listed, respectively, for Messrs. Fontanez and Garza.  See Def.'s Br. filed Mar. 16, 2012, at 13-14.  Even the TEP was not satisfied with that blanket assertion. The fact that the evaluators proceeded to apply typical durations for domestic and overseas tours of duty to determine a total for each of the two requirements (program management and aviation management) is not consistent with defendant's argument that the résumés, as submitted, were fully compliant with the Solicitation's requirements.

The Solicitation did not contemplate that the TEP would be required to assign a duration, based on its members' experience, to qualifying positions.  To the contrary, the Solicitation directs offerors to supply information that would allow qualifying service to be associated with its duration.  The TEP members' drawing on their experience to evaluate offerors is not in itself problematic because the Solicitation permitted the evaluators to do so.  See id. at 109.  It is not inappropriate to generate an assumption based on a tour objective

---

9/ (Cont'd from page 22.)

Mr. Flora, only one of Mr. Rivera's overseas assignments supports the one-year assumption applied by the TEP.  See id.

Mr. Castro's entire military career was spent with the United States Navy (the "Navy").  See Castro Decl. ¶ 5.  To be fair, Mr. Richardson's declarations state that three TEP members are retired military—as opposed to Army—officers; however, the assignments for which the TEP was determining durations were all Army assignments.  Mr. Castro's many domestic assignments ranged from six months to four years,  and the majority of those assignments lasted between one and two-and-one-half years.  See id.  His overseas assignments were for seven months, one year, one-and-one-half years, and four years.  See id.  Even assuming, arguendo, that the Army and Navy have similar policies for tours of duty, Mr. Castro's experience does not support the application of a three-year/one-year assumption.

In aid of this illustration, the court has considered assignments in Puerto Rico as domestic assignments.  Mr. Castro served in Puerto Rico from March 1988 to March 1992 as an Aviation Maintenance Technician and from April 1992 to May 1996 as an Aviation Maintenance/Material Officer.  Castro Decl. ¶ 5(f)-(g).  These are likely separate assignments because Mr. Castro served in two different capacities.  They represent two four-year assignments in Puerto Rico.  If they are not separate assignments, then Mr. Castro should be credited with eight years of domestic experience in Puerto Rico.  Regardless of how the Puerto Rico experience is treated, it does not reflect a typical tour of duty.

or goal, and the court is not suggesting that the three-year/one-year assumption is irrational; however, when an assumption is applied to a particular individual and used to determine the number of years that the individual served when a specific number of years is required to qualify for a position, the application of the assumption may be irrational.

The three-year/one-year assumption derived from the three TEP members' general experience with military policy that identified objectives for the duration of domestic and overseas tours of duty. Although the assumption itself may have a rational basis, it cannot be applied to specific individuals, given the multitude of exceptions to the stated goals. The court holds that the TEP cannot act irrationally in determining that intervenor's proposal met the black-and-white minimum requirements of the Solicitation.

Certainly, the TEP's application of its three-year/one-year assumption was central to its conclusion that intervenor's proposal was technically acceptable. The evaluators rejected intervenor's aggregate statement of years in service and proceeded to use an assumption that could not yield a rational result. Although intervenor claimed that Messrs. Fontanez and Garza had twenty-five and nineteen years of experience, respectively, the TEP disagreed, finding that Mr. Fontanez had eight-and-one-half years of experience and Mr. Garza had seven. See Richardson Decl. ¶¶ 7-8. Five of Mr. Fontanez's qualifying years were from positions for which his résumé did not provide dates of service. See id. ¶ 7. The same is true for six of Mr. Garza's qualifying years. See id. ¶ 8. This is telling. If the TEP had not applied its assumption to intervenor's proposed résumés, Messrs. Fontanez and Garza would not have satisfied the Solicitation's requirements because their résumés "clearly demonstrate," AR 102, only three-and-one-half years and one year of program-management experience, respectively. Having applied an assumption about the length of a typical tour of duty to enable a proposal to satisfy this Solicitation's requirements, the TEP acted irrationally. 10/ Its conclusion that intervenor's proposal was technically acceptable "is so implausible that it [can]not be ascribed to a difference in view or the product of agency

---

10/ Although the court finds that application of the three-year/one-year assumption was irrational, it does not find that the TEP acted arbitrarily by applying knowledge of its members gleaned during their experience with the military to fill "gaps" in plaintiff's proposal. By applying the assumption to the résumés in intervenor's proposal, the TEP was not filling in gaps; rather, the TEP was using an analytical construct to break down and evaluate information that was provided in the aggregate in intervenor's proposal. Plaintiff's proposal, however, contained actual gaps, i.e., omissions, in need of filling in order for the TEP to have before it a proposal that fully addressed the Solicitation's requirements. Thus, the court does not hold that the TEP acted arbitrarily or unequally treated plaintiff and intervenor in failing to supply missing information regarding plaintiff's ability to establish a LOGSA account, plan for incorporating ADDIE into its training program, and failure to supply a management plan that complied with the Solicitation's requirements.

expertise." Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (citation omitted) (internal quotation marks omitted). Accordingly, the agency's determination is found to lack a rational basis.

The court arrives at this conclusion without reference to the subjective judgments that the evaluators made to determine which résumé positions constituted program-management experience. Such determinations, based on the experience of the TEP members, are precisely what was contemplated by the Solicitation. See AR 109. The court does not presume to substitute its judgment for that of the TEP, and it has not undertaken to do so. See E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) ("[T]he minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess."). Nor does the court rely on the opinions of Generals Sottak and Dailey. Those declarations were disallowed to the extent that they stated that rank is correlative to responsibility, thereby indicating that the only way to determine if a position entailed program-management experience was to consider the individual's military rank. See Order entered Mar. 19, 2012, at 5. Thus, the court has not considered whether the TEP's assessment of responsibilities was belied by the ranks associated therewith. See InGenesis, Inc. v. United States, No. 11-754C, 2012 WL 991943, at *7 (Fed. Cl. Mar. 23, 2012) (explaining that Court of Federal Claims engages in "very limited review" and does not review the contracting officer's efforts de novo).

V.  Whether plaintiff was prejudiced by the error in the procurement process

Having identified an error in the procurement process, the court's analysis turns to whether the error was prejudicial to plaintiff. "[T]he prejudice determination assesses whether an adjudged violation . . . warrants setting aside a contract award." Bannum, 404 F.3d at 1354. To demonstrate prejudice, a protester must show that, absent the error in the procurement process, there was a substantial chance it would have received the contract award. Id. at 1353; Alfa Laval, 175 F.3d at 1368 (quoting Statistica, 102 F.3d at 1582); see also Elec. Data Sys., LLC v. United States, 93 Fed. Cl. 416, 435 (2010). In conducting its prejudice analysis, the court is constrained by what is now RCFC 52.1(c) and binding Federal Circuit precedent to make factual findings based on the record before it. See Bannum, 404 F.3d at 1353-54.

Plaintiff explains that, had the TEP not irrationally applied an assumption to intervenor's proposal, it would have had no choice but to find intervenor's proposal technically unacceptable. Not only had intervenor failed to provide specific dates on the submitted résumés, but it proposed a PM and DPM who did not meet the minimum

requirement of having five years of program-management experience. 11/  Pl.'s Br. filed Mar. 20, 2012, at 17.  In the absence of the TEP's irrational evaluation, no proposal would have been technically acceptable.  Id.  Plaintiff contends that, as a result, the agency's options were to engage in discussions with offerors, amend the terms of the Solicitation, or re-solicit the Contract.  Pl.'s Br. filed Mar. 9, 2012, at 15.  Regardless of the option it chose, the agency would have received revised proposals, one of which would have been from plaintiff. Id.  Plaintiff contends that it has a substantial chance of receiving the award, particularly in light of the fact that it is the incumbent contractor [

].  Id.; see also AR 934, 957-58.  Plaintiff finds itself prejudiced by the TEP's flawed evaluation of intervenor's proposal, which deprived plaintiff of the opportunity to submit a revised proposal.

Defendant challenges plaintiff's claim of prejudice by arguing that plaintiff does not have a substantial chance of receiving the award because the agency found that its proposal contained "several material omissions."  Def.'s Br. filed Mar. 16, 2012, at 25.  Although defendant does not identify these omissions, it argues that they cannot be cured.  Id. Defendant concludes therefore, that, even if plaintiff is given the opportunity to submit a revised proposal, it still would be deemed technically unacceptable.  Id.  Plaintiff counters with the assertion that it may cure these deficiencies by providing additional information and proposing different personnel.  Pl.'s Br. filed Mar. 20, 2012, at 18 (citing AR 874-904 (setting forth evaluation of plaintiff's technical proposal and identifying weaknesses and deficiencies)).

---

11/  The Solicitation provides that a proposal may be "removed from consideration" for failure to comply with its instructions for preparation and submission of proposals.  AR 105.  This deficiency does not require automatic disqualification.  Therefore, intervenor's failure to provide specific dates that correspond with the positions listed in its proposed candidates' résumés did not render its proposal technically unacceptable.  However, intervenor's failure to propose individuals who satisfy the qualifications for PM and DPM in Factor 1, Subfactor F would cause it to receive an "unacceptable" rating for that subfactor. See AR 136 (providing, in section M.9, that "a deficient consideration will result in a subfactor rating of Unacceptable").  An "unacceptable" rating for any subfactor would "result in an overall factor rating of unacceptable, as all evaluation criteria must [be] met for technical acceptability."  Id.  Thus, without using the three-year/one-year assumption to assign duration of tours of duty, intervenor would have received an "unacceptable" rating for Factor 1, Subfactor F as a result of its candidates' failure to meet the qualifications for PM and DPM.  Having received an "unacceptable" rating for Subfactor F, intervenor also would have received an "unacceptable" rating for Factor 1, thereby rendering its proposal technically unacceptable.

Despite defendant's claim to the contrary, plaintiff has shown that, absent the TEP's irrational evaluation, it had a substantial chance of receiving the contract award and thus has established prejudice.  See Bannum, 404 F.3d at 1358 (noting that substantial-chance test "is more lenient than showing actual causation, that is, showing that but for the errors [plaintiff] would have won the contract").  The Technical Evaluation Consensus Report for plaintiff's proposal indicates that plaintiff received "unacceptable" ratings for Factor 4: Quality Control and Factor 6: Standardization & Training.  See AR 890, 896.  It received a "marginal" rating for Factor 1: Program Management.  See AR 875.  Defendant contends that plaintiff cannot cure its deficiencies, and plaintiff vehemently disagrees.

Plaintiff's "marginal" rating for Factor 1 resulted from its having received "marginal" ratings for three subfactors within Factor 1.  See AR 875, 878, 881.  The TEP identified a "significant weakness" within Subfactor A: Management Planning & Staffing because plaintiff had failed to demonstrate a clear management plan or identify needed management controls.  See AR 876.  The TEP noted, however, that, [

].  See id.  Although the TEP concluded that it could not evaluate plaintiff on the basis of assumptions related to its incumbency when its proposal lacked information necessary for a full evaluation, id., it is evident that this "marginal" rating resulted from a failure to supply sufficient information.  If the agency were to accept revised proposals, plaintiff would not be prohibited from clarifying its response or providing additional information to demonstrate its ability to meet the requirements in Factor 1.

Similarly, the TEP assigned plaintiff a "marginal" rating for Subfactor C: Flexibility. See id. at 878.  This rating was the result of the TEP's finding that [

].  Id.  However, as plaintiff noted during oral argument, the Solicitation did not include a requirement that [

].  Even if the TEP, following submission of revised proposals, took this into consideration, plaintiff would not be precluded from receiving the contract award.  Although the TEP described plaintiff's showing on this subfactor as a significant weakness, it did not result in an "unacceptable" rating.  Even if, upon reevaluation, plaintiff again were to receive a "marginal" rating, plaintiff still would have a substantial chance of receiving the award, especially if other offerors are evaluated with respect to their [

].

The third "marginal" rating in Factor 1 was in Subfactor F: Senior Program Management Staff/Key Personnel.  See id. at 881.  Plaintiff received this rating because the TEP determined that its proposed DPM did not possess five years of program-management

experience.  Id.  Plaintiff has explained that it can cure this deficiency by proposing a new candidate.  See Pl.'s Br. filed Mar. 20, 2012, at 18.

Plaintiff was rated "unacceptable" in Factor 4 because the TEP concluded that plaintiff did not [

].  AR 892.  Additionally, the TEP found that plaintiff had failed to indicate its ability to establish a LOGSA account.  Id. at 894.  Because both of these deficiencies are described as a failure to provide sufficient information, it appears that, by adding information or clarification to its proposal, as plaintiff has stated it will do, Pl.'s Br. filed Mar. 20, 2012, at 18, plaintiff could cure these problems and thus obtain an "acceptable" or "marginal" rating.

Finally, with respect to Factor 6, plaintiff was faulted for inadequately demonstrating its integration of the ADDIE core processes.  See AR 897.  The evaluators' comments indicated that further explanation would be necessary for plaintiff to demonstrate its ability to satisfy Subfactor A: Core Processes, for which it received an "unacceptable" rating.  As with Factor 4, plaintiff can cure this deficiency by supplying additional information.  Accordingly, because it appears that plaintiff can modify its submission by providing additional information or by proposing an alternative candidate in order to correct those problems that resulted in its technical unacceptability, plaintiff has established prejudice by demonstrating that it has a substantial chance of receiving the contract award.  12/

VI.  Other factors warranting injunctive relief

"The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."  Amoco Prod. Co. v. Vill. of Gambell, AK, 480 U.S. 531, 546 n.12 (1987).  Although plaintiff's entitlement to injunctive relief depends on its

---

12/  The court is not suggesting that plaintiff possesses the ability to satisfy the Solicitation's requirements, particularly in those areas in which it was deemed deficient.  The court merely recognizes that none of the deficiencies that led the TEP to assign plaintiff an "unacceptable" factor rating is incapable of correction.  At a minimum, plaintiff can attempt to cure its identified weaknesses.  If it succeeds in doing so, it will be able to submit a technically acceptable proposal and, [                                    ] has a substantial chance of receiving the award.

The court is not ruling that, if an injunction issues, the agency would be required to accept revised proposals from all offerors and/or open discussions with all offerors.  However, during oral argument, defense counsel stated that plaintiff could be invited to re-propose should an injunction issue.

succeeding on the merits, it is not determinative because the three equitable factors must be considered, as well.  PGBA, 389 F.3d at 1226, 1228-29; see also id. at 1227 ("[N]othing indicates Congress intended to eliminate the Court of Federal Claims' discretion in deciding whether to issue injunctive relief." (citation omitted)).  In this case the court finds that plaintiff has made strong showings on two of the three equitable factors, but did not show that the balance of harms tilts in its favor.  Considering all three factors, the court finds in the exercise of its equitable discretion that injunctive relief is appropriate.

    1. Irreparable harm

    Plaintiff contends that it will be irreparably harmed in the absence of permanent injunctive relief because it will suffer a loss of personnel, many of whom will be hired by intervenor.  Pl.'s Br. filed Mar. 20, 2012, at 19; see also Third Harris Decl. ¶¶ 6, 9. Intervenor will not only appropriate a competitive advantage by acquiring employees familiar with the Contract, but it also will gain access to plaintiff's proprietary information.  Pl.'s Br. filed Mar. 20, 2012, at 19; see also Third Harris Decl. ¶ 6.

    Plaintiff distinguishes Eskridge Research Corp. v. United States, 92 Fed. Cl. 88, 99 (2010), and Consolidated Engineering Services, Inc. v. United States, 64 Fed. Cl. 617, 634-35 (2005), both of which held that an incumbent contractor's loss of employees to the awardee did not constitute irreparable harm.  Plaintiff explains that, in both of these cases, the employees already had left the protesters to work for the awardees.  In Eskridge the court remarked that, because the protester already had incurred this harm, it could not demonstrate that an injunction would ease the harm; in fact, the dispute was a private one between the protester and the awardee.  Eskridge, 92 Fed. Cl. at 99.  According to plaintiff the situation presented in the matter sub judice is more analogous to that in NetStar-1 Government Consulting, Inc. v. United States, 98 Fed. Cl. 729 (2011).  See Pl.'s Br. filed Mar. 9, 2012, at 35-36.  In that case the court held that, because the awardee had made an offer to the plaintiff's current program manager, plaintiff had demonstrated irreparable harm entitling it to preliminary injunctive relief.  NetStar-1, 98 Fed. Cl. at 735.  Appearing to synthesize the outcomes in Eskridge, Consolidated Engineering, and NetStar-1, plaintiff advances the proposition that irreparable harm results from a loss of key personnel "if the damage has not yet been done but can be prevented by an injunction."  Pl.'s Br. filed Mar. 20, 2012, at 19.

    Plaintiff bolsters its argument with declarations from Mr. Harris, plaintiff's Senior Vice-President of Technical Services and former Program Manager on the previous ARAVI contract, who notes that plaintiff's performance on the current contract will cease on April 10, 2012, after which, in the absence of an injunction, intervenor will commence performance.  Third Harris Decl. ¶ 6.  Mr. Harris avers that, after current contract funding ends, plaintiff will be "decimated" and unable to retain its key employees.  Id. ¶¶ 10-11. Those employees inevitably will be hired by intervenor, rendering intervenor capable of

obtaining plaintiff's proprietary information, including plaintiff's salary structure for the ARAVI program. See id. ¶¶ 6, 20. Mr. Harris stated that the information to which intervenor would gain access—such as management plans and vendor lists—"is competitively useful in this procurement" and will enable intervenor to be more competitive if proposals are reopened. Id. ¶¶ 19-20.

Furthermore, plaintiff contends that it has been deprived of the opportunity fairly to compete for the Contract. Pl.'s Br. filed Mar. 20, 2012, at 20; Pl.'s Br. filed Mar. 9, 2012, at 35. Citing Overstreet Electric Co. v. United States, 47 Fed. Cl. 728, 744 (2000) (finding that potential loss of business "deriving from a lost opportunity to compete in a fair competitive bidding process for a contract[] has been found sufficient to prove irreparable harm"), plaintiff asserts that this loss of business itself is sufficient to prove irreparable harm. 13/ Pl.'s Br. filed Mar. 9, 2012, at 35.

Defendant first notes that plaintiff's irreparable harm arguments are virtually identical to those it advanced in support of its motion for preliminary injunctive relief and thus are insufficient to establish this necessary factor. Def.'s Br. filed Mar. 16, 2012, at 26. Defendant continues that plaintiff's arguments regarding loss of employees, decimation of its workforce, and intervenor's access to proprietary information are claims of economic harm, which has been held insufficient to establish irreparable harm. Id. (citing Minor Metals, Inc. v. United States, 38 Fed. Cl. 379, 381-82 (1997)). Moreover, the harms alleged are of a type likely to be suffered by any incumbent contractor that is not awarded a follow-on contract. See Def.'s Br. filed Mar. 23, 2012, at 15; Def.'s Br. filed Mar. 16, 2012, at 26 (citing CRAssociates, Inc. v. United States, No. 11-570C, 2012 WL 286870, at *2 (Fed. Cl. Feb. 1, 2012) (explaining, in context of deciding whether to grant stay pending appeal of decision denying protester's motion for judgment on administrative record, that "[n]o federal contractor has a right to maintain its incumbency in perpetuity" and, therefore, loss of advantages of incumbency does not, on its own, entitle protester to relief)).

The Contract at issue involves highly specialized work aimed at assisting a police force in a foreign country. Consequently, the qualified labor pool necessarily is limited, increasing the value of plaintiff's employees. An argument also can be made that, because the employment pool is limited, incumbent contractors who do not secure a follow-on contract should expect to encounter the reality of losing employees to the awardee. Although Eskridge and Consolidated Engineering may be factually distinguishable in that the employees already had left the incumbents and were hired by the awardees, it is not enough

---

13/ Plaintiff did not argue lost profits or a lost opportunity to compete in a fair procurement process in its motion for preliminary injunctive relief. Plaintiff's irreparable harm argument at that time relied on a loss of employees and proprietary information to intervenor. See Pl.'s Br. filed Feb. 16, 2012, at 35-36.

for plaintiff to argue that intervenor will hire its key personnel.   Indeed, the court's conclusion in NetStar-1 that the plaintiff's allegation of potential loss of employees to the awardee was sufficient to establish irreparable harm hinged on the fact that the awardee already had made an offer of employment to the plaintiff's program manager.  See NetStar-1, 98 Fed. Cl. at 735.  In so holding, however, the NetStar-1 court placed more emphasis on the fact that the plaintiff had satisfactorily alleged that, absent an injunction, it would lose the opportunity to compete for the contract—an injury that has been recognized as constituting irreparable harm.  Id. (citations omitted); see also PGBA, LLC v. United States, 60 Fed. Cl. 196, 221 (2004) (recognizing that loss of opportunity to fairly compete for contract can amount to irreparable injury where protester can show that it will "'inevitably' suffer harm" as a result); Overstreet, 47 Fed. Cl. at 744 (noting that "the relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction").

Similarly, plaintiff in the case at bar maintains that, because the technical evaluation involved in this procurement was flawed, it has been deprived of a fair opportunity to compete for award of the Contract.  See Pl.'s Br. filed Mar. 20, 2012, at 20; Pl.'s Br. filed Mar. 9, 2012, at 35.  Recoupment of bid preparation costs or other legal remedy would not serve to remedy plaintiff's loss of profits, key employees, the benefits of incumbency, and the opportunity to participate in a fair procurement process.  Despite lingering concerns that plaintiff's loss of employees is, at this juncture, speculative or is, for all incumbents in a specialized area, a reality that should be expected upon the loss of incumbency, the court finds that plaintiff has demonstrated irreparable harm in the form of lost profits and a lost opportunity fairly to compete.  See Bannum, Inc. v. United States, 60 Fed. Cl. 718, 730 (2004), rev'd and remanded on other grounds, 126 F. App'x 958 (Fed. Cir. 2005); Essex Electro Eng'rs, Inc. v. United States, 3 Cl. Ct. 277, 287 (1983).

### 2.  Balancing of hardship to the parties

Plaintiff urges the court to find that the balance of harms tilts in its favor because it is the agency's actions voluntarily undertaken after the initiation of these proceedings that will cause the harm that the agency claims will occur if an injunction is granted.  Pl.'s Br. filed Mar. 20, 2012, at 21-22.  The agency predicates its argument on the fact that intervenor already has begun procuring the long-lead-time spare parts that had been backlogged.  Id. at 20.  As plaintiff explains, the agency disputes that parts ordered by one contractor can be transferred or received by a different contractor.  See Second Decl. of Terry Lord, Mar. 15, 2012, at ¶¶ 9, 22(A).  Thus, the argument goes, the agency will be harmed should an injunction issue because intervenor cannot transfer the procurement function to plaintiff or another contractor.  Id.

Plaintiff balks that, "in a display of the hubris nestled deep in the heart of this procurement," the agency failed to heed this court's warning that the agency must make its

own assessment of the risk involved in taking any action during the pendency of the protest. Id. at 21-22.   The court had instructed during oral argument on plaintiff's motion for preliminary injunctive relief that it would not hold against plaintiff any harm resulting from the agency's voluntary actions undertaken during the parties' expedited briefing of this matter. Id. at 21; Transcript of Proceedings, Contracting, Consulting, Eng'g LLC v. United States, No. 12-97C, at 22-23 (Fed. Cl. Feb. 24, 2012) ("Tr."). This prediction did not come to pass after the court was advised that the Contract included a transition provision. After the sixty-day transition period had commenced, effective February 14, 2012, when the GAO protest stop-work order was lifted, intervenor began performing the procurement function 14/ and now argues that it will be harmed if it is forced to unwind that part of the Contract. See Pl.'s Br. filed Mar. 20, 2012, at 20-22.

Plaintiff provided the Fourth Declaration of Stephen H. Harris to challenge Mr. Lord's contention that the contractor who orders the parts also must assume responsibility for shipment and receipt of those parts.   Fourth Decl. of Stephen [H.] Harris, Mar. 20, 2012, ¶¶ 4-9. Mr. Harris described how a transfer between contractors can occur, noting that a transfer of ordered items that have not yet shipped will add up to one week to the procurement process. Pl.'s Br. filed Mar. 20, 2012, at 24 (citing Fourth Harris Decl. ¶ 10). Items that already have shipped are treated differently. Id. at 25. Because shipped items would need to be received by the contractor that purchased them, plaintiff proposes that the agency make a sole-source award to intervenor only with respect to these shipped parts. Id. Mr. Lord concedes that the agency possesses authority to enter into a sole-source contract with intervenor on the basis of "unusual and compelling urgency." Second Lord Decl. ¶ 22(A). Mr. Lord takes the position that, if an injunction is granted, in addition to a sole-source contract with intervenor, the agency then must also prepare and execute a sole-source task order with plaintiff to ensure that other program needs are met. See Second Lord Decl. ¶ 22(A)-(B). Mr. Lord does not specify the difficulty or expense the agency would incur by coordinating two contractors, particularly given Mr. Lord's observation that the contract vehicle executed with plaintiff likely would be the same as that under which plaintiff currently is operating. See Pl.'s Br. filed Mar. 20, 2012, at 28; see also Second Lord Decl. ¶ 22(B). Accordingly, plaintiff challenges the agency's alleged harm as speculative. Id. at 28-29.

_____

14/ Although the transition period commenced on February 14, 2012, defendant states that intervenor did not begin performing the procurement element of the Contract until after receipt of this court's decision denying plaintiff's motion for preliminary injunctive relief, Contracting, Consulting, Eng'g LLC v. United States, No. 12-97C, 2012 WL 769102 (Fed. Cl. Mar. 12, 2012). See Def.'s Br. filed Mar. 16, 2012, at 27-28. Mr. Lord, however, notes that intervenor had been performing on the Contract since February 14, 2012. See Second Lord Decl. ¶ 21. It is not clear what functions, in addition to procurement, intervenor was performing, but they have not been argued by the parties.

Defendant contends that the balance of harms lies in the agency's favor because, on account of plaintiff's protests, the agency already has been waiting six months to begin transitioning the Contract to intervenor—a delay that it alleges will jeopardize its mission. Second Lord Decl. ¶¶ 13-18. Acknowledging that intervenor has begun the process of procuring spare parts in accordance with the sixty-day transition period provided for in the Contract, Mr. Lord explains that, should an injunction issue, the agency immediately would be required to execute two sole-source contracts, thereby dividing between two contractors services that it intended to obtain from one. Id. ¶ 22(A)-(C). Coordinating two contractors while implementing any corrective action recommended by the court would be "extremely difficult" and would impose a burden on the agency in terms of time and cost. Id. ¶ 22(C).

Moreover, the parts backlog that has existed since July 2011 would continue to grow during any additional delay. Id. ¶ 23. The inability to undertake repairs would negatively impact the agency's ability to assist with the counternarcotics effort. Id. Although the agency had been exchanging parts among aircraft in the absence of spares, Mr. Lord indicates that exchanging was no longer a viable solution "due to the shortage of operational components to exchange." Id. ¶ 24. The ARAVI program already has suffered a setback because seven aircraft have been grounded and are awaiting repair. Id. According to Mr. Lord, these numbers will continue to grow until the agency can address the backlog and make necessary repairs. Id. Until that time the agency's efforts would be impeded. Id.

In ruling on this factor, the court is faced with multiple competing declarations from Mr. Harris for plaintiff and Mr. Lord for defendant. The declarations dispute whether the Government will be harmed by issuance of an injunction, given that intervenor has begun performing the procurement function of the Contract in order to alleviate the parts backlog. Neither plaintiff nor defendant can be faulted for existence of the backlog. The backlog resulted from budgetary concerns that led the agency to issue a limited-scope task order to plaintiff that permitted plaintiff to continue performing some services for the ARAVI program, but ordered plaintiff to cease procuring parts.

The declarations also express disagreement regarding the possibility of transferring ordered spare parts between contractors. Compare Second Lord Decl. ¶¶ 9, 22(A) with Fourth Harris Decl. ¶¶ 4-10. In support of its position that the transfer of warranties and parts from one contractor to another is possible, plaintiff explains that it engaged in such activities when it took over performance of the ARAVI contract from the previous incumbent, Lockheed Martin. See Fifth Decl. of Stephen H. Harris, Mar. 27, 2012, ¶¶ 6-7. Mr. Lord responds by noting that plaintiff had served as Lockheed's subcontractor and had been responsible for procurement, thereby avoiding any issues that otherwise would arise. See Fourth Decl. of Terry Lord, Mar. 28, 2012, ¶ 3. Mr. Harris's declaration also challenges that only "minor portions" of the Contract had been transitioned to intervenor and proceeded

33

to identify various requirements and the contractor presently responsible for performance of each requirement.  Fifth Harris Decl. ¶¶ 11-16.  He concludes not only that intervenor has not yet assumed responsibility for most functions, but also that it has not yet procured any spare parts or sent any parts for repair.  Id. ¶¶ 10, 13.  Therefore, a permanent injunction would not cause the harm that the agency claims, particularly with respect to the transfer of parts, given that intervenor's present involvement is limited.

Although Mr. Lord disputes Mr. Harris's conclusions as inaccurate, he does not refute Mr. Harris's declaration with specific examples of parts that intervenor has ordered or sent away for repair.  See Fourth Lord Decl. ¶ 4.  Mr. Lord, however, does indicate that intervenor has contacted vendors and obtained all permissions necessary for procurement.  Id. ¶ 8.  Mr. Lord does not counter Mr. Harris's assertion that plaintiff, not intervenor, currently is performing most contract requirements, but the former does note that the agency did not anticipate that plaintiff would turn over these functions until expiration of its current task order on April 10, 2012.  See id. ¶¶ 9-10.

To the extent that intervenor must be the contractor to receive parts or warranties, plaintiff proffers as a solution execution of a sole-source contract between the agency and intervenor.  Without providing details, Mr. Lord responds that requiring the agency to divide services that it intended would be performed by one contractor would entail significant investments of time and money.  Second Lord Decl. ¶ 22(C).  Mr. Lord describes such a situation as "unprecedented," noting that the agency would be in a position of having to coordinate with two contractors.  Id.

Intervenor has demonstrated restraint by not offering its version of its activities during the transition.  Advising that intervenor, of course, had its story to tell, intervenor counseled that Mr. Lord is the arbiter of positions that reflect the competitors' self-interest.

The court recognizes that plaintiff has mounted a vigorous factual effort to counter defendant's showing that the balance of harms lies with the Government.  In the circumstances, as argued by intervenor, plaintiff's declarations do not preponderate and, given that Administrative Contracting Officer Lord is the government official responsible for this transition, his opinion on the agency's ability to meet program goals should be accorded the usual presumptions in favor of a government official in the discharge of his duties.  Moreover, in permitting intervenor to commence performance during the pendency of this protest, the agency was not exacerbating the harm that it would suffer should an injunction issue.  To the contrary, the Contract itself provided for a sixty-day transition period, and plaintiff's attempt to enjoin such activity was denied.

While the agency has been acting pursuant to the Contract in allowing intervenor to proceed, the court must note that Mr. Lord based a good deal of his assessment of harm on

progress that intervenor was to make on tasks to be performed by April 10, 2012, and today is April 3.  Yet, plaintiff has not demonstrated that the harm it would incur—lost profits and the loss of key employees, proprietary information, and the benefits of incumbency—outweighs the potential harm to the Government, which includes avoiding complications in the receipt of necessary parts.  Accordingly, the court defers to Mr. Lord's assertions and finds that the balance of the harms tilts in the Government's favor.

### 3.  The public interest

Finally, both plaintiff and defendant argue that concern for the public interest warrants a finding in their favor.  Plaintiff contends that the public interest in preserving the integrity of the procurement system is not served if the agency is permitted to exceed its authority in evaluating contractors' bids. Pl.'s Br. filed Mar. 9, 2012, at 40 (citing PGBA, LLC v. United States, 57 Fed. Cl. 655, 663 (2003) ("[T]he public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." (citations omitted))).  Defendant responds that the public interest is concerned with avoiding judicial interference with the procurement process unless the agency is violating applicable laws or regulations. Def.'s Br. filed Mar. 16, 2012, at 28 (citing JDL Constr., Inc. v. United States, 14 Cl. Ct. 825, 829 (1988) ("Th[e] court should not lightly interfere with a government procurement.")).

The court understands that this is an important mission involving a large amount of money.  As such, it warrants more than a nod at compliance with the Solicitation's requirements to ensure that those given program-management responsibilities for the program are qualified.  The court recognizes the significance of the nation's counternarcotics efforts and interest in preventing incumbent contractors that have exhausted contract extensions from obtaining additional extensions by initiating court proceedings. Notwithstanding the foregoing, it is evident that the agency drafted a detailed and sophisticated Solicitation in an effort to secure the services of the most qualified offeror. The failure of intervenor's candidates' résumés to "clearly demonstrate the degree of significant experience as it relates to the position qualifications," AR 102, which comprehends the duration of that experience, flies in the face of the agency's objective in issuing such a comprehensive Solicitation.  Despite its recognition that a permanent injunction will delay full implementation of the counternarcotics mission, the court finds that this element favors plaintiff in that the agency's drafting of the Solicitation evinces not only that it expected the successful offeror to provide information in a manner that enabled the association of experience with its duration, but also that it was going to great lengths to ensure that the Contract would be awarded to the most qualified offeror.

Although the TEP concluded that intervenor's proposal was technically acceptable, it reached too far to do so because the proposal, as submitted, did not "clearly demonstrate"

that Messrs. Fontanez and Garza had the requisite experience.  The TEP conceded this point when it rejected the statement of aggregate years of service in each résumé and proceeded to assign a duration to each listed position.  Establishing strict, exacting requirements and qualifications is inconsistent with review and selection on the basis of the irrational application of an assumption based on a typical tour of duty to assign a number of years to a given individual's assignment.  Moreover, the agency has been aware of the evaluators' strained efforts to find a rationale that made intervenor's proposal compliant since Mr. Richardson submitted his declaration to the GAO and identified the process by which the TEP found intervenor's proposal technically acceptable.  It could have taken corrective action earlier and required intervenor, along with all other eligible offerors, to submit compliant résumés.  Having failed to do so, it cannot now argue that a permanent injunction would be solely responsible for frustrating its mission.

    4.  Assessment of all factors

    The Federal Circuit in PGBA recognized that success on the merits should be the controlling factor in obtaining injunctive relief.  389 F.3d at 1229.  If the protester fails in that regard, the protester cannot qualify for an injunction.  Id.  Absent considerations of national defense and security, see 28 U.S.C. § 1491(b)(3), which defendant has characterized as "a super priority" provision, see PGBA, 389 F.3d at 1225, a protester that succeeds on the merits and satisfies the other injunctive criteria will qualify for an injunction.  15/  The

---

    15/  The court acknowledges the United States Supreme Court's decision in eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 392 (2006), which holds that the four-part test for injunctive relief applies to disputes arising under the Patent Act, 35 U.S.C. §§ 1-376 (2006).  In eBay a jury had found that eBay and Half.com had infringed a patent held by MercExchange, L.L.C. and awarded damages.  See 547 U.S. at 392.  Following the jury verdict, the district court denied MercExchange's motion for a permanent injunction, and MercExchange appealed.  See id. at 391-92.  The Federal Circuit reversed, citing its general rule that a litigant in a patent-infringement dispute is entitled to a permanent injunction if it can demonstrate success on the merits, i.e., that the opposing party infringed its patent.  Id.  In reversing the Federal Circuit, the Supreme Court stated that it "has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed."  Id. at 392-93.  The Court remarked that a plaintiff must satisfy all four factors to demonstrate an entitlement to permanent injunctive relief.  Id. at 392.  The matter was remanded for further proceedings "consistent with traditional principles of equity."  Id. at 395.  The Federal Circuit has not addressed whether eBay's formulation replaces the "tradition of equitable discretion in issuing injunctive relief."  PGBA, 389 F.3d at 1227.  eBay is distinguishable because it involved an earlier rule in patent cases in which a litigant could obtain injunctive relief merely by demonstrating that its patent had been infringed.  See eBay, 547 U.S. at 392.

findings come down foursquare in plaintiff's favor on the merits and on two of the remaining three equitable considerations.

The balance of harms to the parties weighs in the Government's favor because plaintiff could not show that the contract administration will not be affected adversely. The scenario that the Federal Circuit affirmed in PGBA was that, although the protester established that the award was arbitrary, capricious, and prejudicial, the trial court had declined injunctive relief based on the balance of the hardships and the public interest—both of which favored allowing the Government and the awardee to proceed. 389 F.3d at 1223. Indeed, in connection with a second motion for reconsideration, the trial court in PGBA conducted an evidentiary hearing on the effect of granting or denying injunctive relief. See id. at 1223. The record on cross-motions in the case at bar affords full record support for a finding that, overall, the equitable factors favor plaintiff, or, put another way, plaintiff has prevailed on the merits and on two injunctive factors by a decided preponderance of the evidence.

In the circumstances plaintiff is entitled to its injunction against further performance, although the agency is not constrained to take any action other than refraining from proceeding on the Contract with intervenor. The agency may seek revised proposals consistent with the Solicitation, or cancel the Solicitation and reissue a solicitation, or determine that another course of action should be undertaken.

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1. Plaintiff's motion for judgment on the administrative record is granted, and defendant's and intervenor's cross-motions for judgment on the administrative record are denied.

_____

15/ (Cont'd from page 36.)

Moreover, the case says nothing that suggests that the Scanwell line of cases—which accords the Court of Federal Claims equitable discretion in deciding whether or not to grant injunctive relief, see Domenico Garufi, 238 F.3d at 1332; see also PGBA, 389 F.3d at 1227—no longer represents good law. Accordingly, the court does not rule that eBay's assertion that a party seeking injunctive relief in a patent case must satisfy all four factors displaces the balancing of the factors that is the hallmark of deciding whether or not to grant injunctive relief in the context of a bid protest.

2.   Defendant, through the Department of State, its officers, agents, employees, and all other persons acting in connection therewith, shall not proceed with the transition under Contract No. SAQMMA11C0225 awarded under Solicitation No. SAQMMA11R0043 on October 15, 2011, to DynCorp International, LLC, or issue a Notice To Proceed to DynCorp on the subject Contract, and the contracting officer shall direct DynCorp to cease performance thereon.   The Clerk of the Court shall enter judgment accordingly.

3.   By April 13, 2012, the parties shall identify by brackets any material subject to redaction before the order issues for publication.   The parties shall include a cover sheet that identifies the pages in this opinion on which requested redactions appear.


/s/ Christine O.C. Miller
_____
**Christine Odell Cook Miller**
Judge